RENDERED: MARCH 13, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0080-ME

N.L. AND B.L.                                                          APPELLANTS

APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE LAURA P. RUSSELL, JUDGE
ACTION NO. 23-J-503494-002

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND R.L., A
MINOR CHILD                                                            APPELLEES

AND

NO. 2025-CA-0083-ME

N.L. AND B.L.                                                          APPELLANTS

APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE LAURA P. RUSSELL, JUDGE
ACTION NO. 23-J-503494-003

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND

FAMILY SERVICES AND R.L., A
MINOR CHILD                                                    APPELLEES

AND


NO. 2025-CA-0084-ME


N.L. AND B.L.                                                   APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE LAURA P. RUSSELL, JUDGE
ACTION NO. 23-J-503495-002


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND C.L., A
MINOR CHILD                                                    APPELLEES

AND


NO. 2025-CA-0086-ME


N.L. AND B.L.                                                   APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE LAURA P. RUSSELL, JUDGE
ACTION NO. 23-J-503495-003


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND C.L., A
MINOR CHILD                                                    APPELLEES

AND

NO. 2025-CA-0087-ME


N.L. AND B.L.                                         APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE LAURA P. RUSSELL, JUDGE
                    ACTION NO. 23-J-503496-002


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND T.L., A
MINOR CHILD                                            APPELLEES

AND

NO. 2025-CA-0088-ME


N.L. AND B.L.                                         APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE LAURA P. RUSSELL, JUDGE
                    ACTION NO. 23-J-503496-003


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES AND T.L., A
MINOR CHILD                                            APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, MᶜNEILL, AND MOYNAHAN, JUDGES.

CALDWELL, JUDGE:  N.L. ("Father") and B.L. ("Mother") (collectively, "Parents") appeal from a family court's finding that their minor children were abused or neglected.[1]  We affirm.

**FACTS**

In August and September 2023, the Cabinet for Health and Family Services ("the Cabinet") filed two sets of petitions initiating dependency, neglect, or abuse ("DNA") proceedings regarding Parents' four then-minor children.[2]  One set of petitions (with trailer 002)[3] alleged the oldest then-minor child had been subjected to prolonged confinement in a locked closet and being forced to run several miles on a treadmill as punishment.  These 002 petitions also alleged

---

[1] Since this is an appeal from findings of abuse or neglect, we do not refer to the individual children or parents by name.  Kentucky Rules of Appellate Procedure ("RAP") 5(B)(2) ("Initials or a descriptive term must be used instead of a name in cases involving juveniles, allegations of abuse and neglect, termination of parental rights, mental health, and expungements.").

[2] Parents also had older children, who had already reached the age of majority, living in the family home at that time.

[3] This appeal is from the family court cases with trailers 002 and 003.  No appeal from any case regarding this family with 001 as the trailer is before us here.  Moreover, the record from any 001 case (including any petition(s)) has not been provided to us.

Parents restricted the children's access to food and forced the children to eat cayenne pepper as a punishment. The second set of petitions at issue (those with trailer 003) alleged educational neglect.

The oldest then-minor child ("Child 1") reached the age of majority before the DNA proceedings proceeded to adjudication or disposition.[4] Parents do not challenge the resolution of Child 1's case.

The family court allowed the three youngest children to remain in Parents' custody at all times relevant to this appeal. However, it ordered Parents to immediately enroll the three youngest children in public school in August 2023.

The DNA proceedings concerning the three youngest children proceeded to adjudication and disposition. After hearing evidence, the family court issued an adjudication order with findings of fact and conclusions of law in the summer of 2024. The court found each of the three youngest children to be abused or neglected. It found Parents had failed to provide the education necessary for each child's well-being. The court also found the three youngest children's welfare had been harmed by Parents' inflicting emotional injury or allowing the risk of emotional injury to be created.

---

[4] Following adjudication and disposition and the filing of this appeal in January 2025, the oldest of the three children at issue here turned eighteen in the spring of 2025, thus reaching the age of majority. Nonetheless, all three children were still minors at the time of disposition.

Following another hearing, the family court issued an order marked as "disposition" on December 19, 2024.[5] The family court allowed the children to remain in Parents' custody. But it also ordered the Cabinet and Jefferson County Public Schools ("JCPS") to continue to monitor the family. The court also required that Parents must cooperate with the Cabinet and JCPS and that the minor children must attend in-person school daily.

Parents have not argued in their appellate briefs that the court erred in ordering that the children must attend public school. However, they challenge the family court's finding that the three youngest children were abused or neglected. They allege error in the family court's resolution of issues about emotional injury and educational neglect. Further facts will be set forth as needed in our analysis.

**ANALYSIS**

We review the family court's determination that the children were abused or neglected for abuse of discretion. *B.B. v. Cabinet for Health and Family Services*, 635 S.W.3d 802, 807-08 (Ky. 2021). Similarly, we review its evidentiary

---

[5] Despite any informality in the appearance of the December 2024 order and the lack of specific recitation that the order is final and appealable, we accept that this is a disposition order which made the adjudication of abuse or neglect final and appealable. *See J.E. v. Cabinet for Health and Family Services*, 553 S.W.3d 850, 852 (Ky. App. 2018) ("[T]he Court holds that a disposition order, not an adjudication order, is the final and appealable order with regard to a decision of whether a child is dependent, neglected, or abused."). Different judges presided over the adjudication and disposition stages here—with the Hon. Gina Kay Calvert entering the adjudication order and the Hon. Laura P. Russell entering the disposition order.

rulings for abuse of discretion. *Id.* at 807. We also consider whether the family court's findings of fact are supported by substantial evidence and whether the court applied the correct law. *Id.* at 807-08. We review the family court's resolution of legal issues such as the interpretation of statutes *de novo*, meaning without deference. *Davis v. Davis*, 720 S.W.3d 622, 628 (Ky. App. 2025). *See also T.C. v. M.E.*, 603 S.W.3d 663, 679 (Ky. App. 2020) (family court's legal conclusions are reviewed *de novo*).

With these parameters in mind, we consider the parties' arguments.

**Emotional Injury Issues**

KRS[6] 620.100(3) states: "The adjudication shall determine the truth or falsity of the allegations in the complaint. The burden of proof shall be upon the complainant, and a determination of dependency, neglect, and abuse shall be made by a preponderance of the evidence. The Kentucky Rules of Civil Procedure shall apply."

Citing KRS 620.100(3), Mother and Father emphasize that adjudication is for determining whether the allegations in DNA petitions are true. They assert the petitions fail to allege emotional injury. They also contend the 002 trailer petitions do not contain "direct allegations of abuse or neglect specific to these children." (Appellant red brief, page 8). They admit the pleadings were

---

[6] Kentucky Revised Statutes.

amended to include allegations of educational neglect through the filing of the 003 trailer petitions. However, they contend the pleadings were not amended to include allegations of emotional injury.

Parents note the 002 trailer petitions contain many allegations regarding Child 1. However, they assert the petitions fail to allege emotional injury or creating a risk of such emotional harm to the three youngest children. Thus, they contend the family court's entry of findings of emotional injury to the three youngest children exceeded the permissible scope of adjudication under KRS 620.100(3) and, in their view, amounted to fundamental procedural error.

Parents argue on appeal: "The failure to amend the pleadings or introduce individualized allegations deprived the Appellants [Parents] of fair notice and an opportunity to meaningfully contest the claims—both of which are essential elements of due process in juvenile proceedings." (Appellant red brief, page 8).

Parents' initial appellant brief does not, however, provide a specific reference to the record showing if or how they raised this issue to the family court.[7]

---

[7] This Court has previously noted in another case that Parents' counsel, Jason Bowman, failed to comply with appellate briefing rules. *See Williams v. Brown*, No. 2023-CA-0635-MR, 2024 WL 4244466, at *6 (Ky. App. Sep. 20, 2024) (unpublished) (reviewing issue solely for palpable error because appellant brief prepared by counsel failed to provide a preservation statement). We strongly urge counsel to carefully review the Rules of Appellate Procedure and to make sure to comply with these rules before filing any future appellate briefs. Though we decline to impose additional sanctions at this juncture, we are not obliged to be so lenient in the future.

*See* RAP 32(A)(4).[8] Moreover, though the Appellee brief pointed out the lack of a proper preservation statement with specific references to the record in the Appellant brief, Parents did not use their reply brief to correct this deficiency. Since Parents do not cite to the record to show where this issue was preserved for review, we may consider this issue unpreserved and review solely for palpable error resulting in manifest injustice. *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021); *Progressive Direct Insurance Company v. Hartson*, 661 S.W.3d 291, 298 n.9 (Ky. App. 2023); CR[9] 61.02. *See also J.P.T. v. Cabinet for Health and Family Services*, 689 S.W.3d 149, 153 (Ky. App. 2024).

As the Cabinet points out, each petition alleges that the child at issue was abused or neglected with citations to KRS Chapter 620 and to KRS 610.010(2)(d). Thus, the petitions provided notice of claims of dependency, neglect, or abuse even if the petitions do not identify the specific statutory grounds for asserting the children are abused or neglected. *See generally* KRS 600.020(1) (defining the term *abused or neglected child*).

We recognize that the 002 trailer petitions do not explicitly use the term *emotional injury* or explicitly refer to the creation of risks of such injury. *See*

---

[8] We refer to the version of the Rules of Appellate Procedure in effect when the appellate briefs were filed in 2025—rather than to the new version which takes effect April 1, 2026.

[9] Kentucky Rules of Civil Procedure.

KRS 600.020(1)(a)1.-2. We also recognize that many of the allegations in these petitions concern the treatment of Child 1. However, there is not a complete lack of allegations specific to each younger child and the petitions are not identical. For example, these petitions contain descriptions of these three children's individual descriptions of their perceptions of what was happening in the household.

Moreover, while the petitions did not explicitly refer to *emotional injury* or the risk of such injury, they set forth factual allegations which, if proven, could support a finding of emotional injury or at least a creation of a risk of emotional injury. For example, the petitions alleged the younger children were aware of the isolation, confinement, and forced physical exertion of their older brother, Child 1, and at least one child reported they could be sent to Child 1's room for misbehaving. The petitions also alleged the children were only allowed to eat bread and/or nuts if they failed to do their chores and were forced to eat cayenne pepper as punishment.

Consistent with KRS 620.100(3), the family court heard evidence about these allegations in the adjudication hearing and determined these allegations were true in its adjudication order. Therefore, we discern no palpable error resulting in manifest injustice from the family court's making findings regarding

emotional injury despite the lack of more individualized allegations and the lack of explicit reference to *emotional injury* or risk thereof in the petitions.[10]

We further reject Parents' argument that the family court's findings regarding emotional injury were not supported by substantial evidence of emotional injury as defined by Kentucky law. KRS 600.020(26) defines *emotional injury* as:

> an injury to the mental or psychological capacity or emotional stability of a child as evidenced by a substantial and observable impairment in the child's ability to function within a normal range of performance and behavior with due regard to his or her age, development, culture, and environment as testified to by a qualified mental health professional[.]

Parents point out that the Cabinet did not present evidence of an individualized assessment of each of the three youngest children. They contend that the testimony of Dr. Melissa Currie is insufficient evidence to support a finding of emotional injury.

---

[10] Given the lack of preservation of this issue and the factual allegations in the petition, we decline to reach the parties' appellate arguments about the inter-relationship of KRS 620.100(3) and CR 15.02 (regarding trying unpleaded issues by consent and amendments to conform to the evidence). And in any event, we reject Parents' argument that any lack of specificity or lack of explicit reference to emotional injury or risks thereof in the petitions meant that the family court lacked subject matter jurisdiction over the case. Subject matter jurisdiction means a court's authority to hear and rule on a certain kind of case. *Nordike v. Nordike*, 231 S.W.3d 733, 737 (Ky. 2007). The family court had subject matter jurisdiction here since it had authority to resolve this type of case—alleging dependency, neglect, or abuse—pursuant to KRS 610.010(2)(d).

Dr. Currie performed an individual assessment of Child 1, but did not individually meet with his younger siblings. She reviewed the forensic interviews with the three youngest children. Based on these interviews, she determined these three children were harmed by witnessing the treatment of Child 1 (including his confinement, isolation, and forced physical exertion) and being led to believe such treatment was normal and not a cause for concern.

Dr. Currie did not directly observe the three youngest children in person but instead made observations after reviewing their forensic interviews. Her opinion about harm being shown, due to the three youngest children making statements indicating they regarded Child 1's treatment as normal, may be construed as a finding of substantial and observable impairment in the children's ability to function. Even though Dr. Currie evidently did not observe these three children in person, the statutory definition of emotional injury does not specifically require direct observation for a qualified medical professional to render an opinion but simply refers to an "observable" impairment. Although findings of emotional injury may be more typically made after direct observation and individualized assessment,[11] a qualified mental health professional might reasonably "observe" an impairment in certain circumstances by reviewing statements made by the child in question.

---

[11] *See, e.g.*, *Cabinet for Health and Family Services v. L.G.*, 653 S.W.3d 93 (Ky. 2022).

In any event, even assuming *arguendo* that Dr. Currie's testimony is not sufficient to show an actual emotional injury as defined by statute, her testimony coupled with other evidence in the record constitutes substantial evidence supporting a finding of Parents' allowing the creation of a risk of emotional injury to the younger children.

The family court found that the evidence showed Parents either inflicted an emotional injury or allowed the creation of a risk of emotional injury. It quoted KRS 600.020(1)(a)2., which defines *an abused or neglected child* as one threatened with harm by a parent's creating or allowing "to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means[.]"

Noting Dr. Currie's testimony, the family court found the younger children suffered harm from witnessing Parents' treatment of Child 1, which the children viewed as normal. It also found that the children's thinking that Parents' locking Child 1 in a room "along with all the other behavior of the parents" was normal showed an impairment to their development as well as a harmful belief system. (Page 31 of Adjudication Order attached as Exhibit B to Appellant red brief). The family court had earlier noted evidence of Parents' behavior, including putting cameras in every room of the house except bathrooms, giving the children little privacy.

Immediately after its written finding of infliction of emotional injury or allowing the creation of risk of emotional injury, the court also identified Parents' restricting the children's access to food as another concern. Thus, we cannot agree with the contention in the reply brief that witnessing Parents' treatment of Child 1 was the only basis for the family court's findings regarding emotional injury.

In sum, the family court did not misapply the law, its findings of fact are supported by substantial evidence, and we discern no abuse of discretion in the court's finding the children to be abused or neglected due to Parents' creating a risk of or inflicting emotional injury. *See B.B.*, 635 S.W.3d at 807. Moreover, we certainly discern no palpable error resulting in manifest injustice from the family court's resolution of emotional injury issues for which Parents do not provide specific cites to the record to show preservation. Thus, we affirm the court's adjudicating the three youngest children to be abused or neglected based on Parents' inflicting an emotional injury or allowing the creation of a risk of such injury. Next, we address the parties' arguments about educational neglect.

**Educational Neglect**

KY. CONST.[12] § 5 provides in pertinent part: "nor shall any man be compelled to send his child to any school to which he may be conscientiously

---

[12] Constitution of Kentucky.

opposed[.]" Nonetheless, KRS 620.010 states children have fundamental rights, including "the right to educational instruction" and the right to develop to their mental, emotional, and physical potential. Moreover, Kentucky law defines *an abused or neglected child* as including a child who is harmed or threatened with harm by his or her parents' failure to provide adequate education despite the parents' having the financial or other means to provide such an education. KRS 600.020(1)(a)8.

No Kentucky statute specifically defines what an adequate education is for purposes of DNA proceedings. Also, there is a dearth of binding prior Kentucky precedent about determining issues of alleged educational neglect in a homeschool setting.

Parents contend the family court erred in adjudicating the three children to be abused or neglected based on educational neglect. They assert that Kentucky law does not establish specific, clear requirements for what must be taught and how in a homeschool setting to avoid a finding of educational neglect. The Cabinet apparently admits that Parents' educational neglect arguments were raised to the family court and thus preserved for review.

Parents argue the family court erred in treating a homeschool information packet provided by the Kentucky Department of Education as binding authority. They point out this packet is neither a codified statute nor a promulgated

regulation and the Department of Education has no authority to certify homeschools. While we ultimately conclude that the family court did not err in finding educational neglect, we agree with Parents that the homeschool packet is not itself a binding authority.

Parents also contend the family court erred in finding educational neglect based on their not complying with the requirements of statutes which parents assert do not apply to homeschools. Regarding the family court's finding that Parents failed to keep accurate attendance records, Parents assert that homeschools are not private schools. Thus, they contend KRS 159.040's requirement that private schools maintain attendance registers does not apply to homeschools.

Parents also contend that homeschools are not subject to the minimum number of instructional hours and attendance days required by KRS 158.070(1)(f). They assert KRS 158.070 only applies to common or public schools. *See also* KRS 158.030 (defining *common schools*).

Parents also argue that KRS 158.080, which requires instruction in core subjects required to be taught in public school, only applies to private schools which elect to seek certification pursuant to KRS 156.160(2). KRS 158.080 expressly applies to "Private and parochial schools certified in accordance with KRS 156.160(2)[.]" KRS 156.160(2) states: "Any private, parochial, or church

school may voluntarily comply with curriculum, certification, and textbook standards established by the Kentucky Board of Education and be certified upon application to the board by such schools." Parents contend homeschools cannot seek or obtain certification under KRS 156.060(2) so they assert that KRS 158.080's requirements cannot apply to their homeschool.

However, regardless of whether the family court was correct in determining that Parents violated the specific statutes cited in its adjudication order,[13] the family court also found a lack of any significant formal instruction being provided by Parents via homeschooling. Kentucky law makes clear that children are entitled to significant, formal educational instruction. It also holds parents accountable for educational neglect if they fail to provide substantial educational instruction to their children despite having the means to do so.

The family court specifically found Mother "admitted to laying out the children's work and providing little other instruction or **any** formal instruction time or schedule." (Page 26 of Adjudication Order) (emphasis added). The court also noted Father's testimony about his generating an attendance report, but not

---

[13] Perhaps there is a lack of optimal clarity in some educational statutes about whether such statutes apply to homeschools. It is not always clear whether the General Assembly intended to refer to homeschools or only to schools outside one's home when referring to private schools in various statutes mentioned herein. Nonetheless, as we discuss in the body of this Opinion, Kentucky law makes clear that children are entitled to some modicum of substantial, formal educational instruction and the family court's finding that the children did not receive such education from Parents at home is supported by substantial evidence.

-17-

participating much in homeschooling.  The court also found that Child 1 "reported significant time periods with **no** education or instruction."  (Page 26 of Adjudication Order) (emphasis added).  Additionally, the court found Mother admitted to ignoring the other children's educational needs to focus on Child 1. These findings are supported by substantial evidence based on our examination of the record.

Even if the family court was not entirely correct in construing all requirements of the aforementioned statutes as applying to homeschools, the family court's holding that homeschooling parents are not exempt from the duty to provide an adequate education and can be held liable for educational neglect is still correct.  Moreover, we reject Parents' reading of long-standing precedent to convey a right to homeschool without any possible state intervention to make sure children are receiving an adequate education.

Parents suggest they have a fundamental right to homeschool their children in whatever manner they please pursuant to KY. CONST. § 5.  Moreover, they argue that a right to homeschool children was recognized in *Kentucky State Board for Elementary and Secondary Education v. Rudasill*, 589 S.W.2d 877 (Ky. 1979) (hereinafter "*Rudasill*").  However, *Rudasill* did not directly address any

issues about homeschooling.[14]  Instead, *Rudasill* held that the Commonwealth

cannot validly require accreditation of private or parochial schools or the

certification of teachers in such schools nor can the Commonwealth prescribe

which textbooks must be taught in non-public schools.  *Id*. at 883-84.

Nonetheless, *Rudasill* did not entirely exempt non-public schools

from governmental scrutiny to make sure that children were receiving an adequate

education.  *See id*. at 884 (stating legislation may provide for monitoring whether

---

[14] Portions of *Rudasill* could, however, be read as not supporting a right to homeschool, but simply allowing a parent to decide whether to send his/her child to a public school or to any private or parochial school outside the home.  *See id*. at 881-82 (in discussing the adoption of KY. CONST. § 5 and considerations of whether the legislature should be allowed to require compulsory school attendance, noting:  "The Knott amendment backers and their views that parents should be able to educate their children at the hearthside did not prevail.").  *See also id.* at 883 ("While the legislature could permit education in the home, it has not done so.").

Nonetheless, precedent since *Rudasill*—albeit in cases involving child support issues rather than allegations of abuse or neglect—recognizes that children may be provided an adequate education at home despite not attending a school outside the home if the instruction provided involves sufficient time, effort, and structure to support academic progress.  *See Commonwealth ex rel. Francis v. Francis*, 148 S.W.3d 805, 808 (Ky. App. 2004) (holding student of an unaccredited homeschool program qualified as a high school student for child support purposes because an inspector determined the student received appropriate instruction in key subjects with a parent and stepparent "actively involved with lesson planning and the scheduling of her workload" and based on student's standardized tests and report cards); *Smiley v. Browning*, 8 S.W.3d 887, 889 (Ky. App. 1999) (student taking accredited homeschool correspondence course qualified as a high school student for child support purposes because nothing in the record showed the correspondence course was "a sham operation, or that it does not provide an adequate education to its students which is substantially equivalent to that which might be obtained in a traditional Kentucky public school.").  *See also Mix v. Petty*, 465 S.W.3d 891 (Ky. App. 2015).  *Compare W.R. v. Cabinet for Health and Family Services*, 2025 WL 1667777, at *8 (Ky. App. Jun. 13, 2025) (unpublished) (despite some evidence of the parents' school-age children initially being homeschooled, evidence of lack of instruction at home or elsewhere for years and of eight-year-old being unable to read or to spell more than two words was sufficient to support a finding of educational neglect in a DNA proceeding).

students are receiving an adequate education at private or parochial schools through standardized testing).

In discussing the history of the adoption of Section 5, the *Rudasill* court made clear that the prevailing constitutional delegates intended for children to receive substantive, structured instruction to prepare them to be responsible voters and citizens. It concluded that the delegates who adopted Section 5 "intended to permit the Commonwealth to prepare its children to intelligently exercise the right of suffrage by compelling attendance at a **formal** school, public or private or parochial, for a legislatively determined period each year." *Id*. at 883 (emphasis added). The court also discussed how the term *school* referred to a place of systematic instruction. *Id.* at 882-83. And as the family court noted, our Supreme Court recognized that instruction in "reading, writing, spelling, grammar, history, mathematics and civics" was rationally related to preparing children for responsible citizenship. *Id*. at 883 n.10.

In addition to concluding that Parents violated several specific statutory requirements (some of which may not clearly apply to homeschools),[15] the family court also essentially found that Parents failed to offer substantive, formal structured educational instruction in the home. Its finding of a lack of

---

[15] To the extent that the family court erred in applying specific requirements in KRS Chapter 158 or Chapter 159 to homeschools, any error was harmless, *see* CR 61.01, given the court's well-supported findings of lack of substantive, formal educational instruction.

substantive formal instruction is supported by substantial evidence and does not reflect an abuse of discretion nor a misapplication of Kentucky law.

"One of the legislative purposes of the dependency, neglect, and abuse statutes is to protect a child's fundamental right to educational instruction." *M.C. v. Commonwealth*, 347 S.W.3d 471, 473 (Ky. App. 2011) (citing KRS 620.010). The family court here noted evidence that the minor children occasionally received worksheets to complete. However, as the family court's findings indicate, the evidence does not show that the children received formal, structured educational instruction from Parents in the home. *See id.* (child's excessive absences from school meant child was unable to benefit from "the instruction, structure, and socialization provided in a classroom setting")

Moreover, we have recognized that a finding of educational neglect may be supported by evidence of a child's not receiving regular, recurrent educational instruction. *Id.* ("[W]e conclude that providing an adequate education for a child's well-being necessarily requires a parent to ensure the child attends school each day to participate in educational instruction."). Evidence of substance supports the family court's finding that the minor children at issue here did not receive regular, recurrent educational instruction in the hit-or-miss homeschool environment provided by Parents. The lack of such regular instruction is further supported by evidence of the children's being several levels behind their expected

grade levels based on age—despite a lack of evidence of diagnoses of learning disabilities or other special needs.

We do not necessarily disagree with Parents' suggestion that a child's simply being behind the expected grade level for his/her age is not enough, by itself, to show educational neglect. However, the evidence presented indicated the children tested multiple levels behind expected grade levels. And Parents presented no evidence of trying to obtain diagnoses or treatment for the three youngest children despite referring to them as having special needs.

The family court also discussed evidence of other matters showing a lack of significant time or attention to academic instruction in Parents' home. As the family court noted, the JCPS inspector/social worker/liaison testified to the worksheets provided by Mother being for grade levels substantially lower than the expected grade levels for the children's respective ages. The family court also found it significant that Mother testified to viewing any education beyond a sixth-grade level as optional—even for high-school age children. It also paid heed to the JCPS inspector's testifying to Parents' only coming forward with evidence of about two weeks' worth of schoolwork for the approximately two-year period in which the family lived in Louisville. In short, ample evidence supported the family court's finding of a lack of the regular and recurrent formal educational

instruction due children according to *M.C.* and *Rudasill*, so the family court's finding of educational neglect is well-supported.

Thus, we affirm the family court's findings that the children were abused or neglected. Further arguments raised in the parties' briefs which are not discussed herein have been determined to lack merit or relevancy to our resolution of this appeal.

## CONCLUSION

For the foregoing reasons, we **AFFIRM**.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Jason A. Bowman
Louisville, Kentucky

BRIEF FOR APPELLEE
COMMONWEALTH OF
KENTUCKY, CABINET FOR
HEALTH AND FAMILY
SERVICES:

Michael J. O'Connell
Jefferson County Attorney

David A. Sexton
Assistant Jefferson County Attorney
Louisville, Kentucky